(d)    Neither TBF nor any partner or associate thereof was related to the debtors or their officers or directors, nor had TBF represented or provided services to the debtors, their officers or directors.

This Court approved TBF's employment as Committee counsel by Order dated April 25, 2001 (D.I. 246).

    6.    On or about May 21, 2001, the debtors employed Barry Gold ("Gold"), individually, as a wind-down coordinator, with the intention that he become president and CEO of the debtors upon the procurement of directors' and officers' insurance coverage. Gold became president and CEO of the debtors in or about July 2001.

    7.    At the time Gold came to be employed by the Debtor, several connections between Gold and TBF were unknown to the UST, the Court or other parties in interest, and were not disclosed:

        (a)    On April 26, 2001, Barry Gold and TBF partner Paul Traub formed a Delaware limited liability company known as Asset Disposition Advisors LLC ("ADA") to provide consulting and other services in connection with the liquidation of assets. Gold and Traub were the only members of ADA. *See* Objection by Traub Bonacquist & Fox LLP to Motions Seeking, *inter alia*, Sanctions, Disgorgement of Fees, and Immediate Removal of Traub Bonacquist & Fox LLP Filed by Robert K. Alber and Collateral Logistics, Inc. (D.I. 2171; "TBF Objection"), ¶16; *see also* Barry Gold's Response to Emergency Motions Filed by Robert K. Alber and Collateral Logistics, Inc. (D.I. 2169; "Gold Response"), ¶ 15.

(b) ADA was at that time indebted to TBF for funds that TBF lent to ADA so that ADA could compensate Gold for his efforts during the initial launch of ADA. *Id.* at ¶¶ 18, 19.

(c) TBF had engaged Gold in early 2001 to serve as a consultant to TBF on behalf of other TBF clients in matters unrelated to the debtors. TBF Objection, ¶ 12.

8. TBF did not file a supplemental Rule 2014 affidavit or otherwise disclose in this case the above connections between Gold and Traub/TBF.[1]

9. In January, 2002, the Committee applied to expand the scope of TBF's retention to include representation of the estate in a state court action against Goldman Sachs. TBF partner Michael Fox filed a supplemental Rule 2014 affidavit in connection with the application (D.I. 838), reaffirming each statement in his original affidavit and affirmatively stating that

> TBF continues to be a 'disinterested person' pursuant to 11 U.S.C. section 327 and I know of no reason why it cannot continue to represent the Committee in connection with the matters set forth in the Application and this Supplemental Affidavit.

Fox's supplemental Rule 2014 affidavit does not disclose the relationship between Traub and Gold.

10. eToys' liquidating plan of reorganization was confirmed on November 1, 2002, and became effective on November 5, 2002. Thereafter, TBF was awarded final compensation and reimbursement of expenses in the amounts of $1,591,719.70 and $56,404.58, respectively.[2]

---

[1] Gold, as an employee of the debtors rather than a professional employed under 11 U.S.C. §§ 327(a), was not required to file a Rule 2014 affidavit. Gold has stated that he did not discuss his interest in ADA with the debtors. *Id.* at ¶ 19.

[2] TBF's fees and expenses for the months prior to Gold's employment were $182,300.25 and $11,210.64, respectively. TBF's fees and expenses for May 2001, the month in which Gold became an eToys employee, were $151,705.50 and $9,503.70, respectively. The May 2001 sums

4

11. Under eToys' confirmed plan, Gold is the reorganized debtor's sole officer and director, and is also the plan administrator. Morris Nichols Arsht & Tunnell continues to represent the reorganized debtor. The confirmed plan provides for a Post Effective Date Committee of Unsecured Creditors (PEDC). TBF and Jaspan Schlessinger Hoffman represent the PEDC. The UST is informed that TBF's post-effective date billings to the PEDC have been over $1.9 million.

**Duty of Disclosure**

12. Under FED.R.BANKR.P. 2014(a), a professional to be employed pursuant to Sections 327, 1103 or 1114 of the Bankruptcy Code must disclose certain relationships: "The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." Under Del.Bankr.LR 2014-1(a), the duty of disclosure imposed by FED.R.BANKR.P. 2014(a) is a continuing duty:

> Promptly after learning any additional material information relating to such employment (such as potential or actual conflicts of interest), the professional employed or to be employed shall file and serve a supplemental affidavit setting forth the additional information.

Section 328(c) of the Bankruptcy Code provides a tool for enforcement of the continuing duty of disclosure. Thus, in *In re Leslie Fay Companies*, 175 B.R. 525, where the debtor's counsel failed to disclose to the court its ongoing representation of the Audit Committee and its members, the court reduced counsel's compensation, holding that:

---

have not been apportioned by date.

> All facts that may have any bearing on the disinterestedness of a professional must be disclosed. Consistent with the duty placed on the professional, it is the responsibility of the professional, not of the court, to make sure that all relevant connections have been brought to light. [citations omitted]. So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees or even disqualification. [citations omitted].

175 B.R. at 533.

13. The court and parties in interest police conflicts through mandatory disclosure of relationships under FED.R.BANKR.P. 2014(a). The scope of disclosure is broader than the question of disqualification; the applicant and the professional must disclose, without exception, all connections and not merely those that rise to the level of conflicts. *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998).

14. The Rule 2014 disclosure obligation is a critical one. In *In re Enron Corp.*, 2003 WL 223455 (S.D.N.Y. 2003), the court observed: "The purpose of Rule 2014(a) is to provide the court and the United States trustee with information to determine whether the professional's employment is in the best interests of the estate." The professional must disclose all connections; he may not pick and choose which connections to disclose and which to ignore as unimportant or trivial, *In re Jore Corporation*, 2003 WL 22048517, *20 (Bankr. D. Mont. July 28, 2003). The professional may not leave the court or other parties in interest to search the record for such relationships or otherwise to ferret them out. *In re BH & P, Inc.*, 949 F.2d 1300, 1317-18 (3d Cir. 1991).

15. The court may find a disclosure violation even where it would not have found a professional not disinterested had there been timely and complete disclosure of a connection. *Matter of Olsen Indus., Inc.*, 222 B.R. 49, 60 (Bankr. Del. 1997). Indeed, a disclosure violation,

even one that is merely negligent rather than willful, and even one that causes no harm, may nonetheless result in sanctions that include disqualification and/or disallowance of fees. *BH&P, supra*, 949 F.2d at 1318; *see also Jore, supra*, at *20. In *In re A C and S, Inc.*, 297 B.R. 395 (Bankr. D. Del. 2003), the court noted that "[n]ot every violation of the disclosure requirements of the Code and Rules requires disgorgement [of fees], but 'a bankruptcy court should punish a willful failure to disclose connections under FED.R.BANKR.P. 2014 as severely as an attempt to put forth a fraud on the court.'" *Id.* at 405, *quoting In re Crivello*, 134 F.3d 831, 836-37 (7th Cir. 1998). In *Olsen Indus., supra*, the court held that because it had found a law firm's disclosure violation to be intentional and serious, it was not necessary for the court to rule on the disinterestedness issue. 225 B.R. at 60.

16.   Regardless of whether such connections affected its disinterestedness, TBF was obligated to disclose its connections with Gold as soon as the debtors employed Gold. *See Matter of CF Holding Corp.*, 164 B.R. 799, 806-07 (Bankr. D. Conn. 1994)(debtor's financial advisor denied over $795,000 in fees and expenses for failure to timely disclose investment in entity whose controlling principal sought to purchase majority interest in reorganized debtors; fees of debtor's counsel reduced by $250,000 for failure to bring matter to court's attention after acquiring actual knowledge of financial advisor's actions).

17.   When the debtors employed Gold in May 2001, TBF's relationship with Gold became a fact bearing on TBF's disinterestedness. TBF therefore had a duty to disclose its relationship with Gold. TBF breached that duty. When TBF filed a supplemental affidavit in January 2002, TBF compounded its previous Rule 2014 violation when it reaffirmed all of the statements in its original Rule 2014 affidavit and affirmatively represented that it continued to be

a "disinterested person." By remaining silent about its relationship with Mr. Gold and later affirmatively misrepresenting that it had no connections to him, TBF precluded any inquiry – by the UST, by the court, and by other parties in interest – regarding whether TBF remained qualified to represent the Committee. Had TBF made appropriate and timely disclosure, the UST, the court and other parties in interest would have been able to evaluate TBF's disinterestedness and its ability to continue providing impartial and detached advice to the Committee and, if appropriate, to seek disqualification or denial of compensation of TBF under 11 U.S.C. § 328(c).

18. TBF asserts that its failure to disclose its connections to Gold was a mistake and oversight, not intentional wrongdoing. TBF attributes the nondisclosure to several circumstances: ADA was a newly formed business, and Traub (the TBF partner who is a member of ADA, had limited involvement in the case after June 1, 2001; Gold's employment by the debtors was not related to ADA; TBF has no interest in ADA; and Traub and Fox have always treated ADA's business as separate and apart from TBF's affairs. TBF Objection, ¶ 37. TBF further asserts that although Traub and Fox considered amending their disclosures in 2003 (as a result of their July 2003 disclosure of the relationship between TBF and ADA in the *Bonus Stores* case, No. 03-12284 (MFW), they determined that it was not necessary to do so because the eToys plan had already been confirmed and gone effective. *Id.* at ¶ 38.

19. In the context of TBF's experience, the multiple connections between TBF and Gold, and the facts surrounding Gold's employment, TBF's failure to disclose any of its three distinct connections with Gold is difficult to understand as inadvertent rather than deliberate. TBF's partners are experienced bankruptcy practitioners who have filed retention applications in

a number of cases in Delaware and other judicial districts. They are not strangers to the court or the retention process, nor are they strangers to the comprehensive and ongoing relationships analysis that any professional must perform when it seeks to be employed by a trustee or official committee in a bankruptcy case. More significantly, TBF was specifically aware in this matter, from discussions with the Office of the United States Trustee, of the UST's concern about replacing corporate officers with individuals related to any of the retained professionals in the case. TBF Objection, ¶ 10. Finally, Gold's employment by the Debtor was not something that just happened without TBF's involvement and caught them by surprise; rather, TBF on behalf of the Committee recommended Gold to the Debtor. TBF Objection, ¶ 11.

20. Notably, TBF does not claim ignorance of its connections with Gold. For example, Traub signed a Rule 2014 affidavit in the *Homelife* case, No. 01-2412 (JJF) in July 2001 disclosing the connection that Gold and ADA had to TBF. Nor does TBF profess ignorance of the continuous self-examination that must be performed in accordance with FED.R.BANKR.P. 2014. By remaining silent about its relationship with Gold when it had a duty to disclose, and later by affirmatively misrepresenting that it had no connections to Gold, TBF precluded any inquiry – by the UST, by the court, and by other parties in interest – regarding whether TBF remained qualified to represent the Committee.

21. TBF's failure to disclose its connection to Mr. Gold seriously affected the integrity of the judicial process, precluding a determination of whether the connection between Gold and TBF was a disqualifying one that made TBF's continued employment as Committee counsel inappropriate.

22. Once the debtors employed Gold, and especially when he became an officer of the debtors, TBF's was no longer a disinterested person.[3] TBF's Rule 2014 violation masked its lack of disinterestedness. Specifically, TBF's relationship with Mr. Gold by way of ADA was a direct or indirect relationship to or connection with the debtor that was an interest materially adverse to the unsecured creditors whom TBF represented, such that TBF no longer complied with 11 U.S.C. § 101(14)(E).

23. The Bankruptcy Code does not define the term "adverse interest," and whether one exists must be determined on a case by case basis. *BH & P, supra*, 949 F.2d at 1315-16 (3d Cir. 1991). A court may consider an interest adverse to the estate when counsel has "a competing economic interest tending to diminish estate values or to create a potential or actual dispute in which the estate is a rival claimant." *In re First Jersey Securities, Inc.*, 180 F.3d 504, 509 (3d Cir. 1999). Here, Gold's employment created competing economic interests for TBF attorneys which tended to diminish estate values for unsecured creditors.

24. Members of a creditors' committee owe a fiduciary duty to the committee's constituents – the general unsecured creditors. *Westmoreland Human Opportunities, Inc. v.*

---

[3] Under 11 U.S.C. § 101(14), "disinterested person" means person that--
(A) is not a creditor, an equity security holder, or an insider;
(B) is not and was not an investment banker for any outstanding security of the debtor;
(C) has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor, or an attorney for such an investment or banker in connection with the offer, sale, or issuance of a security of the debtor;
(D) is not and was not, within two years before the date of the filing of the petition a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph; and
(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason.

*Walsh*, 246 F.3d 233, 256 (3d Cir. 2001). Consistent with its fiduciary duty, the fundamental purpose of a creditors' committee is to maximize the distribution to its constituents. *In re Life Services, Inc.*, 279 B.R. 503, 513 (Bankr. W.D. Pa. 2002), *citing In re Nationwide Sports Distributors, Inc.*, 227 B.R. 455, 463 (Bankr. E.D. Pa. 1998). Committee counsel's job is to provide impartial and detached advice to aid the committee in performing its fiduciary duty.

25.  Gold's employment by eToys impaired TBF's ability to continue providing the Committee with impartial and detached advice, because TBF was faced with conflicting loyalties. The service as Debtor's CEO of an individual who was partners with TBF's lead name partner in a startup business venture, the success of which was necessary to enable it to repay loans to the law firm, and also an individual whom TBF relied upon as a consultant in many other contexts, inescapably compels the conclusion that there was no independence between the Debtor and the Committee. Traub, TBF and Gold had a clear interest in maintaining and enhancing the business relationships among themselves. It is unrealistic to expect that the numerous connections between Gold and TBF would not influence the interactions between TBF and the Debtor and TBF's ability to evaluate the Debtor's decisions and actions dispassionately. Thus, TBF's relationship with Gold was materially adverse to the interests of the Committee and its constituents.[4]

**Remedies for TBF's Nondisclosure of Its Connections With Gold**

**The Court's Continuing Authority to Impose Remedies**

26.  Evidence of the connection between TBF and Gold in this case was not brought to the attention of the UST until more than three and one-half years after this Court approved TBF's

---

[4] Additionally, TBF's relationship with Gold may have impaired Gold's ability to perform his fiduciary duties to the debtors' constituents other than general unsecured creditors.

11

employment as Committee counsel, two years after plan confirmation, and one and one-half years after entry of the order granting TBF's final application for compensation and reimbursement of expenses.[5]

27.  A court may ordinarily disqualify a professional, deny compensation in whole or in part, or even order disgorgement of compensation, doing so under its inherent power to supervise the professionals who appear before the court. *In re Kaiser Group Intern., Inc.*, 272 B.R. 846, 850 (Bankr. D. Del. 2002). Arguably, the passage of time in this case makes it more difficult for the UST to seek, and for the Court to grant, remedies for TBF's disclosure violation.

28.  FED.R.BANKR.P. 9024 provides in relevant part that "[R]ule 60 F.R.CIV.P. applies in cases under the Code except that . . . (3) a complaint to revoke an order confirming a plan may be filed only within the time allowed by § 1144...."[6] F.R.CIV.P. 60 in turn provides in relevant part that:

. . . .

> (b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc. On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons" (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); fraud (whether heretofore denominated as intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; . . . (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time,

---

[5] Although the connection between TBF and Gold was disclosed in other cases, the disclosures must stand on their own in each case under Title 11. A professional may not leave the court or other parties in interest to search the record for a professional's relationships or otherwise to ferret out those relationships within a single case. *In re BH & P, Inc.*, 949 F.2d at 1317-18. It would be even more inappropriate to expect the court or other parties in interest to do so across unrelated cases.

[6] 11 U.S.C. § 1144 requires that a request to revoke an order of confirmation be filed before 180 days after entry of the order.

12

> and for reasons (1), (2) and (3), not more than one year after the judgment, order or proceeding was entered or taken. . . . This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order or proceeding, or. . . to set aside a judgment for fraud upon the court. . . . [T]he procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action.

Because more than one year has passed since entry of the orders authorizing TBF's employment and granting TBF's final compensation, TBF might question the availability of relief under F.R.Civ.P. 60(b)(2) and/or (b)(3). Nonetheless, the Court retain's authority to revisit its prior orders, and to impose a remedy for TBF's failure to disclose its relationship with Gold, based on fraud on the court.

29. Fraud upon the court, as distinguished from common law fraud, equitably tolls the time for seeking to set aside a judgment or order. The purpose is not to avoid prejudice to the rights of parties but to protect the integrity of the court. In *Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 64 S.Ct. 997 (1944), the Supreme Court explained that the inquiry focuses on whether the alleged fraud harmed the judicial process, not on whether it harmed a party:

> [T]ampering with the administration of justice in the manner indisputably shown here [counsel fraudulently created evidence and introduced it trial] involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always await upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

*Id.* at 1001.

30. The Third Circuit has not addressed the standard for what constitutes "fraud upon the court," but other courts have described it as "an unconscionable plan or scheme to improperly

13

influence the court or interfere with the judicial machinery performing a task of impartial adjudication, as by preventing an opposing party from fairly presenting his case or defense." *Herron v. United States of America*, 2004 WL 2040272, *4 (E.D. Pa. Sept. 10, 2004), *citing In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 538 F.2d 180 (8th Cir. 1976). "[F]raud upon the court as distinguished from fraud on an adverse party is limited to fraud which seriously affects the integrity of the normal process of adjudication." *Id.* In an alternative statement of the standard, the *Herron* court quoted *King v. First Am. Investigations, Inc.*, 287 F.3d 91, 95 (2d Cir. 2002):

> Fraud upon the court should embrace "only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases." In order to sustain an independent action pursuant to Rule 60(b), however, a claimant must adequately allege a grave miscarriage of justice. *United States v. Beggerley*, 524 U.S. 38, 46-47, 118 S.Ct. 1862 (1998)("Independent actions must, if Rule 60(b) is to be interpreted as a coherent whole, be reserved for those cases of 'injustices which, in certain instances, are deemed sufficiently gross to demand a departure' from rigid adherence to the doctrine of res judicata.")(citing *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244, 64 S. CT. 997 (1944).

*Id.*

31.     The First Circuit Court of Appeals has added to the foregoing definitions the further statement that "fraud on the court 'is an intentional deflecting of the Court from knowing all the facts necessary to make an appropriate judicial decision on the matter before it.'" *Pearson v. First NH Mortgage Corporation*, 200 F.3d 30, 37 (1st Cir. 1999), *quoting In re Pearson*, 210 B.R. 500, 510 (Bankr. D. NH. 1997)(which the citing opinion reversed on other grounds), in turn citing *In re Tri-Cran, Inc.*, 98 B.R. 609, 615-16 (Bankr. D. Mass. 1989). In *Tri-Cran, supra*, the bankruptcy court stated that "[w]here a judgment is obtained by fraud perpetrated by an attorney acting as an officer of the court, the judgment may be attacked for fraud on the court. 'Since

attorneys are officers of the court, their conduct, if dishonest, would constitute fraud on the court.'" 98 B.R. at 616, *quoting H.K. Porter Co. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1119 (6th Cir. 1976).

32. In bankruptcy cases, nondisclosure of relationships in connection with the retention of professionals may rise to the level of a fraud upon the court. *See Pearson, supra; In re R&R Associates of Hampton*, 2003 WL 1233047 (Bankr. D. N.H. January 31, 2003).

(a) In *Pearson*, the debtor and the Tamposi family ("Tamposi") were co-shareholders of BWI, a corporation formed to develop a condominium. BWI obtained construction financing from First Bank. Attorneys from the Wadleigh Firm prepared the loan documents, including Pearson's personal guaranty, on behalf of First Bank. When BWI defaulted on its obligations and First Bank proceeded to foreclose its mortgage, the Wadleigh Firm represented Tamposi, not in defending against the foreclosure but instead in forming Spring Pond Development Corporation ("Spring Pond"), which proceeded to acquire the BWI condominium in the foreclosure sale. First Bank also assigned to Tamposi its right to collect nearly $500,000 from Pearson under to his personal guaranty. Various lawsuits among Pearson, First Bank and Tamposi ensued, including a suit by Pearson alleging that First Bank and Tamposi used the BWI foreclosure action as part of a conspiracy to deprive Pearson of his 50% interest in BWI.

(b) During the pendency of the litigation, Pearson filed a Chapter 7 bankruptcy petition, employing Gannon, a partner in the Wadleigh Firm, as his bankruptcy counsel. Gannon submitted a Rule 2014 affidavit affirmatively stating that he and the Wadleigh Firm had no connections with Pearson's creditors or any party in

interest, their respective attorneys or accountants. Gannon did not disclose his firm's prior representation of First Bank in the preparation of the BWI loan documents, nor did he disclose his firm's representation of Tamposi in forming Spring Pond. Later, the Chapter 7 trustee employed Gannon as special counsel to pursue the estate's claims against Tamposi and First Bank, and a settlement of those claims was approved on March 28, 1996. The settlement agreement between the Chapter 7 trustee and the bank purported to release, among other things, any claims the estate had against Gannon and the Wadleigh Firm.

    (c)    One year and one day after the court approved settlement of the estate's claims against First Bank, Pearson (represented by new counsel) moved to vacate the order approving the settlement. Pearson alleged that the Chapter 7 trustee, First Bank and the Wadleigh Firm obtained approval of the settlement by committing a fraud on the court, acting in concert to conceal the Wadleigh Firm's conflict of interest from the court and thereby to preclude Pearson from pursuing malpractice claims against the Wadleigh Firm. The bankruptcy court denied Pearson's motion without permitting preliminary discovery or an evidentiary hearing because Pearson had not produced a "smoking gun" indicating that the Chapter 7 trustee, First Bank or the Wadleigh Firm intended to conceal a conflict of interest. The district court affirmed.

    (d)    On further appeal, the Court of Appeals for the First Circuit reversed, stating that Pearson had pleaded a colorable claim that Gannon and his firm had conflicts of interest, that they had failed to disclose Gannon's and his firm's connections and conflicts of interest, and that Gannon had affirmatively misrepresented there were none:

> Attorney Gannon did not simply remain silent, but instead submitted the verified statement required by Bankruptcy Rule 2014, asserting without qualification that he had "no connections" with any Pearson creditors. Furthermore, not only was the verified statement demonstrably false, but Gannon submitted chapter 7 schedules which failed to list potential conflict-of-interest claims against himself and the Wadleigh Firm. Whatever the precise dimensions of the duties of disclosure imposed upon counsel under the Rules of Bankruptcy Procedure, we cannot envision that they offer comfort for affirmative misrepresentations to the court itself.

200 F.3d at 38. The court also stated that Gannon and the Wadleigh Firm had "circumvented effective bankruptcy court oversight." *Id.* at 39. The *Pearson* court further noted that "[w]hatever safeguards counsel may realize in remaining silent do not extend to deliberate efforts to mislead the court through inaccurate representations." *Id.* at 41.

    (e)    With respect to remedies, the *Pearson* court stated that if it were proven that there had been a fraud on the bankruptcy court, it was within that court's power to fashion an appropriate remedy court stated that it was within the bankruptcy court's discretionary power to tailor an appropriate remedy:

> [T]he bankruptcy court may determine that it is not appropriate to disturb the compromise, but nevertheless invoke its inherent powers to sanction any person found to have perpetrated a fraud on the court. *The nature of any such sanction should be determined with a view to its deterrent value, not necessarily limited to the harm caused litigants.*

*Id.* at 42 & n.7 (emphasis added).

33.    In this case, as in *Pearson*, a grave miscarriage of justice took place when TBF continued in its role as Committee counsel; TBF's nondisclosure of its relationship with Gold and its subsequent misrepresentation that it had no connections circumvented effective court oversight and deprived this Court of the ability to assess TBF's ability to continue representing the Committee after the debtors employed Gold.

34.	In *R&R Associates, supra*, a Chapter 11 debtor partnership applied to employ Thomas, a member of Thomas & Utell, as its counsel. The retention application and Thomas's Rule 2014 statement both asserted that neither Thomas nor his firm had any connections with the debtor, its creditors or any parties in interest, and that Thomas and his firm were "disinterested."

(a)	In fact, as the bankruptcy court later found, Thomas and his firm represented one of the debtor's partners, Gaudette, and Gaudette's wife individually, and also represented several other entities controlled by the Gaudettes. Thomas & Utell had assisted the Gaudettes with the formation of three family limited partnerships and the transfer of assets into those partnerships which might otherwise have been used to satisfy the debtor's obligations. Thomas & Utell also represented the Gaudettes in various state court litigation matters. They therefore had relationships that "may have been adverse" to the debtor and its creditors and should have been disclosed. 2003 WL 1233047 at *4.

(b)	After the case was converted to Chapter 7, Thomas and his firm were awarded $18,887 in fees and expenses of $221.30. More than a year after entry of the fee award, the Chapter 7 trustee filed suit against Thomas and his firm, asserting that counsel misrepresented or failed to disclose their relationships to the Gaudettes and the Gaudette entities when applying for employment as counsel to the Chapter 11 debtor, and that they had negligently failed to pursue actions against the debtor's partners for the debts of the partnership, both of which constituted fraud upon the court.

(c)	Because the Chapter 7 trustee had not demonstrated that counsels' failure to disclose their connections with the debtor and the debtor's general partners "was the result of some corrupt intent on the part of the Law Firm Defendants," the court found

18

that the trustee failed to prove fraud upon the court. *Id.* at *6. Indeed, the court appeared to accept the attorney's defense that the disclosure violation arose not from corrupt intent but from his novice's misunderstanding of Rule 2014; the case was his first Chapter 11 case and he had borrowed a Rule 2014 disclosure form from another attorney in his firm. *Id.* at *5.

    (d)  Nonetheless, the court ordered disgorgement of all fees and expenses previously awarded to Thomas and his firm as a sanction for failure to make the required disclosures. *Id.* The court held that it had the authority under Sections 327(a) and 328(c) to order disgorgement of fees, even if already paid. The court also held that even absent a specific finding of ill will or wrongful intent, failure to disclose a relationship is in and of itself a sufficient basis for total disgorgement of fees and expenses.

  35.  Unlike *R&R Associates*, this case does not involve novice bankruptcy counsel who borrowed a form of Rule 2014 affidavit from another attorney in the firm. It instead involves experienced bankruptcy practitioners who have filed applications to be retained as Section 327 or Section 1103 counsel in numerous large and sophisticated Chapter 11 cases, both in Delaware and elsewhere. TBF's partners are well-versed in the comprehensive and ongoing relationships analysis required of a professional employed at estate expense. And as discussed earlier in this Motion, TBF had engaged in discussions with the Office of the United States Trustee about replacement officers of the debtors, and was aware of the UST's concern that the replacement officers not be related to any of the professionals employed in the case. This, it is respectfully submitted, is all of the intent needed to demonstrate that TBF's Rule 2014 disclosure violation was a fraud upon the court.

19

### The Court Should Grant a Substantial Remedy Against TBF

36.     A court's power to order disgorgement of a professional's fees and expenses should be "exercised with restraint and discretion;" in exercising that discretion, the court "should apply principles of equity, as other courts have done." *Olsen Indus., supra*, 222 B.R. at 62. consider By the same token, the nature of the sanction "should be determined with a view to its deterrent value, not necessarily limited to the harm caused litigants." *Pearson, supra*, 200 F.3d at 42 n.7. The Court must also consider that TBF's Rule 2014 violation harmed the integrity of the Court and of the judicial process. In this case, it also undermined public confidence in the integrity of the bankruptcy process.

37.     TBF was awarded fees and expenses of $1,591,719.70 and $56,404.58, respectively, for its services prior to the effective date of the debtors' liquidating plan. As set forth earlier in this Motion, TBF's fees and expenses for the months before Gold's employment by the debtors were $182,300.25 and $11,210.64, respectively. TBF's fees and expenses for May 2001 (the month in which Gold became an eToys employee) were $151,705.50 and $9,503.70, respectively, the UST has not attempted to apportion those fees. However, even if all of TBF's May 2001 fees and expenses were treated as having been earned or incurred before Gold began working for the debtors, TBF has been awarded $1,293,404.19 of fees and expenses for a period in which it was in violation of FED.R.BANKR.P. 2014(a) and in which it failed to cure that violation, even when filed a supplemental affidavit expressly disclaiming relationships requiring disclosure.

38.     In addition, TBF has billed the PEDC over $1.9 million for post-effective date services; thus, its total compensation and expenses in this case exceed $3.5 million. However,

under the terms of the confirmed plan, the PEDC has the power to select its own professionals without the Court's approval.

39.    The UST respectfully submits that under the circumstances of this case, a substantial disgorgement of up to the full amount of the $1,648,124.28 of fees and expenses awarded to TBF's for its pre-effective date services (less amounts earned prior to any discussion of Gold's employment) may be required in order to provide a deterrent against future violations of FED.R.BANKR.P. 2014(a). Any lesser sanction may simply be viewed as a "cost of doing business" and encourage professionals to encounter the risk of silence in the face of their duty to disclose.

WHEREFORE, the United States Trustee respectfully requests that this Court order the disgorgement of all fees and expenses paid to Traub Bonacquist & Fox for its pre-effective date services, or such lesser amount as the Court deems appropriate, together with such other relief at the Court deems just.

                              Respectfully submitted,

                              **KELLY BEAUDIN STAPLETON**
                              **UNITED STATES TRUSTEE**

Dated: February 15, 2005     BY:  /s/ Mark S. Kenney
                                          Mark S. Kenney, Esquire
                                          Trial Attorney
                                          J. Caleb Boggs Federal Building
                                          844 King Street, Suite 2207, Lockbox 35
                                          Wilmington, DE 19801
                                          (302) 573-6491
                                          (302) 573-6497 (Fax)